reflect the apportionment percentages, if any, found by the next jury.

Affirmed in part; reversed in part; remanded.

882 A.2d 436

PAUL ARISTIZIBAL, JAMES BARRETT, JAMES BOWER, EDWARD BRADY, ROBERT CARTY, JR., STACEY COCOZZA, LOUIS DE-PAUL, ANNESE DONNELL, KEVIN FAIR, JOSEPH FALCONE, STACEY FALCONE, GREGORY FARMER, BRETT FOSTER, KEVIN FRANCIS, MICHAEL GAVIN, KIYIA HARRIS, THOMAS HOLTON IV, OWEN INGENITO, CORNELIUS KANE, LISA KAPLIN, JOHN LABROLI, RICHARD LASCO, DANIEL LOEN, RUDY LUSHINA, DENEEN MANTANI–PAGLIARO, THOMAS MCMEEKIN, MONICA MCMENAMIN, MARY MCMENAMIN, CRAIG MULHERN, EDWARD OBERT, JOSEPH PALAMARO, PAUL PETINGA, LEE RAGOZZINE, LISA SIMS, DAVID SMITH, TIMOTHY SMITH, KIRK SPARKS, CHARLES SUTTON, KELLY THOMAS, PAUL WALSH, WILLIAM WARNER, CHARLES WEBER, WILLIAM WENZ, SABINA WALSH, WIL-LIAM MAZUR, ANDREW LEONARD, RICHARD KRALY, GARY HOLMES, JEFFREY DUNGAN, PLAINTIFFS AND JOHN AN-TORINO, JOSEPH BELL, MARK BURNS, JOSEPH CARUSO, JOSEPH DANIELS, ALBERT FLORIANI, JODY HERSH, ROB-ERT KEPLEY, GENE MAIER, AUTUMN MASON, MICHAEL MASON, THOMAS MCCABE, JAMES MILTENBERGER, THOM-AS NELSON, KIEN NHAN, MICHAEL O'HARA, JAMES PAPAY-CIK, JOSEPH PREVITI, ANDY PRONOVOST, HECTOR REYES, GREGORY RUNDLE, MADELINE VALENCIA RUSH, DAVID SELLITSCH, GEORGE SHICK, JACK VERSEPUT, RAYMOND WAGNER, TORRES MAYFIELD, PAUL MASLOW, JAMES ARM-STRONG, LAUREN ANDREWS–DOWNEY, CRAIG ARGUS, RUS-SELL BOUFFORD, CHRISTOPHER CRUSE, ROBERT DESSICI-NO, BRIAN DOBBINS, REBECCA FORTH, CHARLES FOX, CONSTANT HACKNEY, LEE HENDRICKS, HOWARD JOHN-SON, MICHAEL JONES, SHELLY KELLERMAN, JAMES M. KNIGHTS, EDWARD LEON, WILLIAM LOGAN, MICHAEL

MAYER, SALVATORE RANDO, CYNTHIA RONGIONE, TIMO-
THY ROSE, JAMES SARKOS, JENNIFER SEIF, CHRISTINE
STAINES, GARY STOWE, WILLIAM TRACY, MICHAEL J. TRA-
CY, JARI WRIGHT, MICHELE ZANES, LEE HENDRICKS, AND
JOHN RUSSELL, INTERVENORS, v. CITY OF ATLANTIC CITY,
DEFENDANT.

Superior Court of New Jersey
Law Division Atlantic County

Decided March 17, 2005.

*Michael J. Mackler,* for plaintiffs (*Goldenberg, Mackler, Sayegh, Mintz, Pfeffer, Bonchi & Gill*).

*Frank Lentz,* for Intervenors (*Perskie, Wallach, Fendt & Holtz*).

*Erika A. Appenzeller,* for Intervenors (*Jacobs & Barbone*).

*Christopher A. Brown,* for Intervenor (*Brown & Bergman*).

*Karen M. Williams,* for defendant (*Jasinski and Williams*).

*Paul L. Kleinbaum,* for New Jersey State Policemen's Benevolent Association as *amicus curiae* (*Zazzali, Fagella, Nowak, Kleinbaum & Friedman*).

VALERIE H. ARMSTRONG, A.J.S.C.

## I. *PROCEDURAL HISTORY*

This action commenced on January 20, 2005 upon the Plaintiffs filing a Verified Complaint in Lieu of Prerogative Writs which was accompanied by a proposed Order to Show Cause seeking preliminary restraints. In lieu of holding an Order to Show Cause hearing, the court convened a case management conference on January 21, 2005, the results of which obviated the need to schedule an immediate hearing.

The threshold issue raised in this matter is whether the City of Atlantic City (hereinafter "City") must be enjoined from prosecuting disciplinary actions filed against the 108 Plaintiffs and Intervenors, all of whom are police officers employed by the City. The Verified Complaint also seeks compensatory and punitive damages, as well as counsel fees and costs. The Plaintiffs and the Intervenors have been charged with violations of Police Department regulations occurring on August 21, 2004 and August 22, 2004, resulting from a "sick-out." The Verified Complaint alleges that the City failed to comply with the "45–day rule" set forth in *N.J.S.A.* 40A:14–147 for the filing of a complaint alleging a violation of the internal rules and regulations of a law enforcement

unit. That statutory provision, which is entitled *"Suspension and removal of members and officers; complaint; limitation on filing; notice of hearing,"* provides in pertinent part:

> A complaint charging a violation of the internal rules and regulations established for the conduct of a law enforcement unit shall be filed no later than the 45th day after the date on which the person filing the complaint obtained sufficient information to file the matter upon which the complaint is based. The 45–day time limit shall not apply if an investigation of a law enforcement officer for a violation of the internal rules or regulations of the law enforcement unit is included directly or indirectly within a concurrent investigation of that officer for a violation of the criminal laws of this State. The 45–day limit shall begin on the day after the disposition of the criminal investigation. The 45–day requirement of this paragraph for the filing of a complaint against an officer shall not apply to a filing of a complaint by a private individual.
>
> A failure to comply with said provisions as to the service of the complaint and the time within which a complaint is to be filed shall require a dismissal of the complaint.

During the case management conference, it was agreed that the disciplinary hearings which had been scheduled for January 28, 2005 would be adjourned without date pending further order of the court. The Case Management Order permitted other police officers, in addition to the forty-nine original plaintiffs, to intervene in this matter upon submission of an appropriate order. Further, paragraph 2 of the Case Management Order stated "In view of the agreement to adjourn the disciplinary hearings, in the event the disciplinary hearings are rescheduled, Plaintiffs and the Intervenors waive the right to argue that the hearings are being scheduled more than thirty days from the date of service of the Complaint." [1]

A schedule was established for the filing of briefs and the Answer to the Complaint. The City's Answer to the Complaint was filed on February 7, 2005. Oral argument was scheduled for March 1, 2005.

At the commencement of the March 1, 2005 oral argument, an unopposed Motion filed by the New Jersey State Policemen's

---

[1] *N.J.S.A.* 40A:14-147 requires a disciplinary hearing to take place "not less than 10 nor more than 30 days from the date of service of the complaint."

Benevolent Association requesting to participate as *amicus curiae* was granted.

## II.  *THE FACTS*

The City is a municipality operating under the Mayor–Council Plan of government pursuant to *N.J.S.A.* 40:69A–31–48. The City employs approximately 400 police officers who enjoy protection pursuant to Title 11A, Civil Service, of the New Jersey Statutes.

The Chief of Police is Arthur Snellbaker (hereinafter "the Chief"). The Policemen's Benevolent Association, Local # 24, Inc. (hereinafter "PBA Local 24") is a labor organization serving as the exclusive majority representative of all Atlantic City police officers below the rank of Captain.

On July 6, 2004, Deputy Chief Ernest Jubilee (hereinafter "Jubilee") assumed the duties of Acting Chief of Police until further notice, pending the return of the Chief from a period of convalescence. The Chief returned to active duty on September 23, 2004.

On Sunday, August 22, 2004, the City filed a Verified Complaint and Order to Show Cause in the Superior Court of New Jersey, Chancery Division, in a matter captioned *City of Atlantic City v. PBA Local 24, and its Officials and its Officers, John Does and Jane Does, (said names being fictitious, their names being unknown to Plaintiff)*, Docket No. ATL–C–151–04. On that same date, the Honorable Vincent Segal, J.S.C., serving as the Vicinage I emergent duty judge, executed an Order to Show Cause which provided, among other things, the following:

(a) Defendants, PBA Local 24, its officials, members and the police officers of the City of Atlantic City shall immediately cease and desist from engaging in any type of concerted activity including, but not limited to, a sickout, slowdown, work stoppage or any action which would compromise the safety and security of the general public and the residents of the City of Atlantic City.

(b) The Defendants are ordered to return to their scheduled shifts. Failure to comply with this Order may subject the Defendants, the PBA and its officials and members of the Police Department to fines to be determined by the Court.

Additionally, the Order to Show Cause provided that "The Defendant, Local 24, PBA, Mr. William Curtis,[2] or his designee, shall personally notify all members of Local 24, PBA of the provisions of this Order."

The City's request for injunctive relief on August 22, 2004, was supported by an affidavit from Jubilee, in his capacity as Acting Chief of Police. The following is a summary of the pertinent facts alleged in Jubilee's affidavit:

1. The City's Police Department provides 24-hour, seven day-a-week service to the public, City residents, and the City's visitors.

2. The summer tourist season is a very busy time in the City.

3. The City's Police Department, on a daily basis, engages in situations "ranging from mundane to emergent" necessitating availability and response by law enforcement to a variety of circumstances.

4. The Police Department's daily work day is divided into three work shifts: 12 A.M. to 8:00 A.M., 8:00 A.M. to 4:00 P.M., and 4:00 P.M. to 12:00 A.M.

5. On August 21, 2004, at approximately 3:00 P.M., the entire shift of thirty-four police officers scheduled to work the 4:00 P.M. to 12:00 A.M. shift, called out sick. This is the first time that such an event has occurred in the City.

6. Jubilee immediately contacted PBA Local 24 President Williams to advise him of the developments. Williams, who was out of the state, indicated that he would return to New Jersey later that evening, stating that he did not condone this behavior. Further, he would not oppose any injunction to prevent such actions that would ensure the safety of the general public.

7. On August 22, 2004, all forty-one police officers and investigators scheduled to work the 8:00 A.M. to 4:00 P.M. shift called out sick.

---

2 "William Curtis" is actually Curtis Williams (hereinafter "Williams"), a police officer employed by the City, who on June 30, 2004 was sworn in as the President of PBA Local 24.

8. In order to preempt continuation of the work stoppage that commenced on August 21, Jubilee instructed the Commanding Officers in charge to order the day shift officers to report for duty. Each police officer contacted confirmed that he/she would report for duty during their regularly scheduled shift. Nevertheless, they did not report to work, thereby refusing "the direct order of their superior officers."

9. According to Jubilee, the "unlawful action" resulted from dissatisfaction by the police officers that they had not yet secured a new Collective Bargaining Agreement "upon their terms." Nevertheless, the City continued to engage in good faith negotiations to secure a Collective Bargaining Agreement in the interest of the police officers, while simultaneously meeting the budgetary constraints that affected the City.

10. Attempts by Jubilee and his office to ensure that police officers would report to work, consistent with their sworn duty to protect and serve the general public, were unsuccessful.

Jubilee's affidavit concluded by stating the following at paragraph 9:

> Based on information and belief, the police officers, the PBA and its leadership have and will continue to sponsor and condone this unlawful activity unless it is immediately addressed by Court Order, instructing the police officers to comply with their obligations to report to their regularly scheduled work shift and to provide the services that they have been sworn to do as members of the Police Department of the City of Atlantic City.

Notwithstanding the entry of Judge Segal's Order, the thirty-nine–member shift scheduled for the 12:00 A.M. to 8:00 A.M. shift on August 23, 2004, failed to report to work. Hence, on Monday, August 23, 2004, the City returned to Court requesting sanctions and an order for compliance with the August 22, 2004 Order. The matter was heard by Chancery Division Presiding Judge George L. Seltzer, J.S.C.

In support of the City's request for relief on August 23, 2004, Jubilee provided a supplemental affidavit which reiterated the

events of August 21 and August 22, 2004. Additionally, Jubilee asserted that on August 22, 2004, the shift of thirty-nine police officers scheduled to work the midnight to 8:00 A.M. shift on August 23, 2004, called out sick. Each of these police officers had been advised of the entry of the court Order and had been given a direct order to report to work as scheduled. Further, on August 22, 2004, Jubilee ordered that a Lieutenant be assigned to handle all "call outs." The Lieutenant was to instruct each police officer who attempted to call out sick that an injunction had been obtained from the court and failure to report to work would constitute a violation of a court Order.

On August 24, 2004, Judge Seltzer signed an Order memorializing his decision from the bench on August 23, 2004. Judge Seltzer continued the August 22, 2004 Order. All police officers were ordered to report to work as scheduled and were prohibited from engaging in any "concerted activity" as set forth in Judge Segal's Order.

While Judge Seltzer declined to enter sanctions, he did order both parties to meet and negotiate on August 30, 2004 in an attempt to reach a new Collective Bargaining Agreement. The parties were directed to engage in a telephonic conference with the court on September 7, 2004 to schedule further proceedings. The August 24, 2004 Order also stated that "The Defendant, Local 24, PBA, Mr. Curtis Williams, or his designee, shall personally notify all members of Local 24, PBA, of the provisions of this Order no later than 3:00 PM August 25, 2004."

On August 23, 2004, the City, through its Business Administrator, Benjamin Fitzgerald (hereinafter "Fitzgerald"), filed a "Notice of Minor Disciplinary Action" against each of the police officers scheduled for the three shifts who failed to report to work on August 21 and 22, 2004. These Notices alleged violations of the New Jersey Administrative Code (hereinafter "N.J.A.C.") and the City of Atlantic City Personnel Policy and Procedure Manual. The violations set forth in the Notice served upon each police officer were identical. The N.J.A.C. violations included incompe-

tency, inefficiency or failure to perform duties; conduct unbecoming a public employee; and neglect of duty. Pursuant to the City's Personnel Policy and Procedure Manual, the violations included neglect of duties and unprofessional conduct.

The factual specifications in support of the violations listed in each of the Notices were identical with the exception of the shift worked. For example, police officers assigned to work the 4:00 P.M. to 12:00 A.M. shift on August 21, 2004 were apprised of the following in the Notices of Minor Disciplinary Action:

> On August 21, 2004 at 1600 to 2400 hours the above cited rules and regulations were violated by your participation in illegal concerted activity in not performing or attending to duties as required by law, regulation, rules and contract.

Each of the Notices of Minor Disciplinary Action imposed a monetary fine equivalent to three, four, or five days pay, depending on the shift worked by each police officer. The Notices did not provide the police officers with a process to challenge or appeal the fines.

The City commenced deducting the fines from each police officer's September 4, 2004 paycheck. Approximately one week later, the City reversed the paycheck deductions and returned any fines deducted to the police officers. However, there is no indication in the record before the court, that the Notices of Minor Disciplinary Action were actually rescinded.

On September 29, 2004, the Chief transmitted a written Memorandum to Fitzgerald, objecting to Fitzgerald's discipline of the police officers regarding "the events of the alleged 'blue flu.'" According to the Chief's Memorandum, notwithstanding that the *fines* had been rescinded, the City was in the process of scheduling disciplinary hearings for the police officers. The Chief expressed the opinion that such disciplinary proceedings were "without authority," in that no investigation had taken place, no charges had been filed, and pursuant to the provisions of *N.J.S.A.* 40A:14-118a,[3] and the City Code, it is the Chief of Police, rather than the

---

[3] *N.J.S.A.* 40A:14–118 delineates the authority of a Chief of Police, and the Appropriate Authority to whom the Chief is "directly responsible ... for the efficiency and routine day to day operations thereof...."

appropriate authority, who is responsible for disciplining members of the Police Department. The Chief further noted that "[i]t is clear that the discipline of the Police Department is a function of day to day operations and there is no support for any such action to be brought by the City administration." The Chief's Memorandum concluded with the following:

I am not aware of any investigation taking place that would determine a violation of any rule or regulation. Before any departmental charges can be brought against anyone such an investigation must be conducted. The first step in any disciplinary process is the collection of reports from the officers. Clearly, this can not yet be done. It is my understanding that the Judge has not yet decided whether to impose sanctions on the PBA or any individual officer. This will prevent me from compelling our officers to submit reports that could, potentially, expose them to contempt charges

As the situation now stands I feel it is inappropriate to move forward with any type of disciplinary process. Should the situation change I will reassess the need or desirability of discipline for any officers who, facts reveal violated departmental rules and/or regulations.

On October 4, 2004, Deputy Chief William R. Glass (hereinafter "Glass"), who was assigned to the Police Department's Support Services Division, sent a Memorandum directed to "All Police Personnel" regarding the topic of "Report Required Regarding Calling Out Sick On *August 21 & 22, 2004.*" The Memorandum indicated that at the direction of the Chief, Glass had been assigned to conduct a fact-finding investigation of police personnel who called out sick on August 21 and August 22, 2004. Glass directed that any police officer who received a copy of his Memorandum via departmental e-mail respond to him no later than October 8, 2004, by providing a report addressing the call out procedure followed, the ailment that was reported, and medical treatment, if any, that was received. Further, any medical documentation, such as a doctor's note was to be submitted.

However, later on October 4, 2004, Captain Thomas Coholan (hereinafter "Coholan"), of the Police Department's Support Services Division, who was assigned by Glass to participate in the investigation, sent an e-mail to eighty-four police officers who failed to report for duty on August 21 and August 22, 2004, which stated the following:

To All Personnel,

The above Officers (84 total) who received this memorandum via Departmental e-mail on October 4, 2004 are hereby advised that the directive to submit a report to D/C Glass by October 8, 2004 is suspended until further notice.

The reason for suspending the investigation on the same day it was initiated as to the eighty-four officers is not apparent from the record before the court.

On October 7, 2004, Sidney H. Lehmann, Esquire (Szaferman, Lakind, Blumstein, Blader & Lehmann, P.C.) wrote to the Chief, advising that his law firm represented PBA Local 24. The letter indicated that Lehmann had received a copy of Glass's October 4, 2004 Memorandum. Lehmann's correspondence asserted that the submission of reports to Glass by the police officers who failed to report to work on August 21 and 22 raised serious legal issues, including the constitutional right against self-incrimination. The letter specifically stated the following:

As I assume you are aware, during your convalescence the City issued disciplinary penalties against all officers who were alleged to have been involved in the events of August 21 and 22. Therefore these are no longer matters which are in the investigatory phase. Rather, they are all matters in which these officers have already been charged with a disciplinary offense. Additionally, the City has also applied to the Superior Court relative to those events. The effect, perhaps unintended, of the memorandum of October 4, 2004, is that these officers are being compelled to submit evidence, which could be used against them, in pending contempt proceedings in Superior Court.

Lehmann's letter referred to the fact that Atlantic City police officers are covered by the Federal and State Constitutions, the Civil Service laws of the State of New Jersey, and the Attorney General's *Internal Affairs Policy and Procedures* (hereinafter *"Guidelines"*) governing internal affairs policies and procedures for law enforcement, which guidelines are applicable to all New Jersey police departments pursuant to *N.J.S.A.* 40A:14–181. Lehmann further stated that Civil Service law provides that a protected employee may not be compelled to testify in a disciplinary proceeding against him/herself. Further, the Attorney General's Guidelines state in pertinent part:

However, internal affairs investigators in civil service jurisdictions should be aware that under civil service rules, an employee cannot be forced to testify at his/her

own disciplinary hearing. Thus, as a matter of fairness, the internal affairs investigator in a civil service jurisdiction should refrain from questioning a subject officer with respect to a particular disciplinary offense if the officer has already been charged with the offense and is awaiting an administrative hearing on the charge.

["Internal Affairs Policy and Procedures" of the Police Management Manual promulgated by the Police Bureau of the Division of Criminal Justice in the Department of Law and Public Safety]

Lehmann also expressed concern that state and federal constitutional law, as well as the Attorney General's Guidelines provide protection to a police officer who chooses not to provide evidence in proceedings which could impose serious penalties and/or sanctions against the officer, "including proceedings such as the application currently pending in Superior Court" (an apparent reference to the ongoing proceedings before Judge Seltzer).

Consequently, Lehmann concluded his letter by stating:

... We believe that the implementation of the memorandum of October 4th would violate the rights of these officers. At a minimum, we believe that its implementation should be held in abeyance until we have an opportunity to discuss these matters with you.... We are additionally advising officers that we anticipate that your office would agree to hold these matters in abeyance until we have had an opportunity to discuss them.

By correspondence dated October 8, 2004, Lehmann corresponded with David F. Jasinski, Esquire (Jasinski and Williams P.C.), legal counsel representing the City in the matter pending before Judge Seltzer. Lehmann's October 8 correspondence reiterated similar concerns to those he had expressed to the Chief:

The purpose of this letter is to call these recent developments to your attention; and to urge the City to resolve the confusion created by the redundant legal proceedings it has initiated. Either this matter is still under investigation by the City, or officers have already been charged. If these charges remain in place, than [sic] these officers cannot be required to submit the reports sought by Chief Snellbaker and Deputy Chief Glass. Nor can the City proceed with the disciplinary charges while the City's application for sanctions in the contempt proceeding remain pending. Principles of fundamental fairness, as well as Fifth Amendment protections against self-incrimination and due process of law prohibit municipalities and their police departments from requiring officers to choose between their employment and their constitutional rights. See, *Garrity v. New Jersey,* 385 *U.S.* 493, 87 *S.Ct.* 616, 17 *L.Ed.*2d 562 (1967).

As I indicated in my letter to Chief Snellbaker, the purpose of these communications is to avoid a situation in which officers are subjected to additional discipline if

they do not submit these reports on October 8th, because of these legal concerns. We urge the City to decide how it will proceed so officers to [sic] do not have to choose between the exercise of their rights, and obedience to a directive from the Deputy Chief and Chief of Police.

For all the reasons set forth in our September 8th letter to you, it is also the PBA's position that the discipline issued by the City remains procedurally defective. However, while those charges remain in place and the application for sanctions remain pending, these officers cannot be compelled to risk self-incrimination by providing the reports sought in Deputy Chief Glass's October 4th memorandum. Your prompt attention to this matter is appreciated.

By letter dated October 13, 2004, Judge Seltzer set a schedule to resolve the ongoing litigation between the City and PBA Local 24. Specifically, if the City intended to pursue sanctions, a written application for *R.* 1:10–3 relief and the City's position as to whether the injunction should be made permanent was to be filed with Judge Seltzer prior to November 3, 2004. Judge Seltzer's letter indicated that at some time subsequent to the entry of his August 29, 2004 Order, but prior to his October 13, 2004 correspondence, the City had filed what Judge Seltzer characterized as an oral application for *R.* 1:10–3 relief, stating, "I understand that my file contains no papers seeking that relief. I continued that matter to allow the parties to continue their negotiations." Judge Seltzer concluded his letter by stating "I further ask Mr. Jasinski and Mr. Lehmann to explain why, in the absence of any continuing violation, I should not simply convert the injunction to a permanent injunction (terminating the litigation) and dismiss any claims for enforcement as moot."

On October 26, 2004, Fitzgerald sent a memorandum to the Chief which stated in pertinent part:

As you know the actions in question on August 21st and August 22nd occurred during your convalescence. The Acting Chief of Police was Deputy Chief Jubilee and it was Deputy Chief Jubilee who directed the orders of the officers on August 21st and August 22, which were refused. In addition, Deputy Chief Jubilee provided the necessary affidavits documenting the job action. Consequently, your absence at this time, we believe, should preclude you from modifying the City's response to the events that occurred in August.

As we have repeatedly stated, the unlawful concerted work stoppage which occurred in August is of concern to this Administration. However, as of this date no officers have provided any information to anyone justifying their concerted absences on August 21st and August 22nd. You have taken the position that absent

some sustainable "reasonable grounds to believe", it is inappropriate to charge officers for their unplanned absences. Such an argument misses the obvious. The reasonableness lies in the very fact that an entire shift called off at one time during heated contract negotiations, this cannot be a mere coincidence. Additionally, the City had a reasonable basis for its belief that the officers engaged in an unlawful activity as evidenced by the fact that a Superior Court Judge issued an injunction prohibiting further absences based on the information accumulated and submitted to the Court.

Fitzgerald's memo advised that the City Administration did not intend to punish police officers without just cause. He directed the Chief to resume the investigation which he had initiated "as it pertains to all officers that may have participated in any unlawful concerted job action who were not in violation of the court order in this matter. This shift (Charlie Platoon) will be dealt with after Judge Seltzer issues his decision as to any possible sanctions." The Chief's report and recommendations were to be submitted to Fitzgerald no later than November 11, 2004.

A Memorandum dated November 1, 2004 from the Chief to Fitzgerald advised that he had instructed Glass to resume the investigation and that Glass was to provide his report to the Chief in sufficient time to meet Fitzgerald's deadline of November 11, 2004. This Memorandum also stated:

I again express my concerns regarding potential conflicts with the previously issued disciplinary action as noted by Mr. Lehmann. I understand that I have the responsibility to comply with your directives in this matter and I shall do so as promptly and completely as possible. I again recommend that Mr. Lehmann's concerns be reviewed to ensure thaty [sic] action we take is both appropriate and sustainable.

On November 2, 2004, Coholan transmitted another e-mail to eighty-four police officers which stated the following:

To All Personnel,

The eighty-four (84) Officers receiving this e-mail directly are advised that the fact finding investigation regarding personnel who called out sick on August 21st and August 22nd, 2004 has resumed. Personnel who called out sick on those two dates are to respond to the attached directive by November 5, 2004. Any Officer who had originally responded to the initial directive *must* resubmit a report.

On November 3, 2004, the City filed a Motion in ATL–C–151–04 pursuant to *R.* 1:10–3 seeking sanctions in the form of a judgment in the amount of $19,635.84 against "Defendants" representing (1)

overtime paid by the City expended to provide police protection during the "unlawful sick out;" and (2) legal fees and costs. Further, the City requested that "to the extent that the Court deems it appropriate, contempt proceedings should be initiated."

The PBA Local 24, its President and Vice–President filed a Crossmotion seeking to dismiss the City's Complaint, or, in the alternative, seeking the dismissal of all aspects of the Complaint other than converting the temporary injunction into a permanent injunction for a limited period of time not to exceed six months from August 22, 2004.

On November 5, 2004, Lehmann corresponded with Jasinski. Once again, he objected to police officers having to respond to the investigation being conducted by Glass in view of the fact that the City had, through Fitzgerald, filed Civil Service disciplinary charges against the police officers and was seeking sanctions against them in the Superior Court. Lehmann stated:

> Moreover, our office has now received copies of an application by you, as attorney for the City, to the Honorable George L. Seltzer, J.S.C., in City of Atlantic City v. PBA Local # 24, et al., Docket No. ATL–C–151–04, in which the City is renewing its request for sanctions against officers who it alleges participated in the disputed events, and requesting additional damages as sanctions. One must assume that Deputy Chief Glass' memorandum is being submitted in conjunction with the City's renewed efforts to impose sanctions upon these police officers. In effect, the City is attempting to compel these officers to be witnesses against themselves in what amounts to a contempt proceeding.
>
> As indicated in my earlier letter, it is the City that chose to impose Civil Service disciplinary [sic] first and conduct its investigation later. As set forth in my earlier letter to you and to Chief Snellbaker on October 7, 2004, the governing internal affairs policy and procedures prohibit questioning an officer with respect to a particular disciplinary offense if the officer has already been charged with that offense. This prohibition has been given the force of law by N.J.S.A. 40A:14–181 ... Therefore, as previously indicated, while those charges are pending, the Internal Affairs Guidelines prohibit these officers from being questioned about these incidents.
>
> Since some of these matters are currently pending before Judge Seltzer, it might be appropriate to raise these issues within the context of that proceeding. In any event, it is inappropriate to require these officers to submit reports for all the reasons set forth in this letter and our previous correspondence.

On November 12, 2004, the Chief, in another Memorandum to Fitzgerald, advised that there would be a delay in submitting

Glass's investigation report, due to the fact that several months earlier Glass had scheduled vacation during the month of November 2004.

On December 14, 2004, Judge Seltzer entered the following Order resolving Docket No. ATL–L–151–04:

1. Plaintiff's application for the imposition of sanctions be and the same hereby is denied.

2. Defendant's application to dismiss the complaint and dissolve the temporary restraint previously entered be and the same hereby is granted.

3. This Order is without prejudice to plaintiff's institution of an appropriate action seeking damages as the result of the events described in this complaint.

On December 17, 2004, approximately four months after the sick-out, the two captains in the Police Department's Support Services Division assigned to conduct the investigation, reported to Glass that six of the police officers charged in the Notices of Disciplinary Action issued by Fitzgerald on August 23, 2004, had provided a doctor's note/medical report documenting their absence.

On December 22, 2004, the Chief filed Notices of Pending Disciplinary Action against more than 100 police officers, alleging violations of the Atlantic City Police Department Rules and Regulations, specifically, unauthorized absence and neglect of duty, and of the state Administrative Code violations for neglect of duty and "other sufficient cause." The Notices specified that each of the police officers charged had violated various rules and regulations by participating in "illegal concerted activity in not performing or attending to duties as provided by law, regulation, rules and contract." The Notices stated: "You are hereby advised that based on information that has been brought to the attention of the Chief of Police, you are the target of a pending disciplinary action that may result in a reprimand, suspension or termination." Each Notice advised the officer charged of his/her right to a full hearing and the right to consult with legal counsel and/or a union representative.

The Notices further advised that if the officer charged desired to waive a hearing, disciplinary action would be imposed in the

form of a fine for a specified number of working days, depending on which shift was involved. The factual specifications in these Notices were identical to the Notices issued by Fitzgerald in August 2004. However, the charges were slightly different. The Notices of Pending Disciplinary Action filed by the Chief specified two administrative code violations, while Fitzgerald's Notices charged three such violations. The Chief's Notices charged two violations of the Atlantic City Police Department Rules and Regulations, namely, unauthorized absence and neglect of duty. The Notices filed by Fitzgerald charged "neglect of duties" and unprofessional conduct pursuant to the City of Atlantic City Personnel Policy and Procedure Manual, Section X.

## LEGAL ANALYSIS

Judicial and administrative case law interpreting and applying the 45–day rule set forth in *N.J.S.A.* 40A:14–147 is rather limited. While reported decisions addressing this statutory provision involve factual patterns distinguishable from the instant matter, a review of those cases is helpful in understanding the intent of the 45–day rule.

In the matter of *Division of State Police v. Maguire*, 368 *N.J.Super.* 564, 847 *A.*2d 614 (App.Div.2004), State Trooper Maguire, who had been involved in an off-duty road rage incident was suspended for fifteen days without pay by the Division of State Police. While the primary issue in *Maguire* upon appeal to the Appellate Division was whether the Division of State Police properly utilized a hearing officer, rather than an Administrative Law Judge to conduct Maguire's disciplinary hearing, a threshold issue raised by Trooper Maguire was that all of the charges should have been dismissed, "due to the Division of State Police's failure to abide by the 45–day rule under *N.J.S.A.* 53:1–33." That statutory provision has a 45–day time rule that is identical to the statutory provision at issue in the instant case.

In *Maguire*, the incident for which Trooper Maguire was disciplined occurred on June 29. Subsequent to the incident, an

investigation commenced and was completed on August 15. A report of the investigative findings was forwarded to the Superintendent of the State Police on September 3, 2002. Thereafter, in early October 2002, upon following a prescribed protocol for review of the legal sufficiency of the charges, Maguire was charged with various violations of the Rules and Regulations of the Division of State Police. Hence, the filing of the charges occurred more than 100 days after the precipitating incident of June 29, 2002.

In observing that the Superintendent of the State Police was statutorily authorized to discipline the State Police, the Appellate Division stated:

[W]e believe the relevant statute is unambiguous and clear on its face, and consequently we apply it as written. *State v. Butler,* 89 *N.J.* 220, 226, 445 *A.*2d 399, 402 (1982). The 45–day period began to run in this matter on September 3, 2002 *when the Superintendent received the investigative report.* Because charges were filed on October 1, 2002 and served on Maguire on October 7, 2002, the Division has complied with *N.J.S.A.* 53:1–33. [emphasis added]

[*Id.* at 570, 847 *A.*2d 614 (emphasis added).]

In the matter of *Grill v. City of Newark,* 311 *N.J.Super.* 149, 709 *A.*2d 333 (Law Div.1997), two Newark police officers filed suit to overturn their removal by the City of Newark Police Department. They sought reinstatement to their former positions with back pay, as well as benefits retroactive to the date of their suspensions. The plaintiffs asserted that the Preliminary Notices of Disciplinary Action and Charges and Specifications were not served upon them within the 45–days required by *N.J.S.A.* 40A:14–147. Therefore, they argued that the charges against them must be dismissed.

The *Grill* plaintiffs had been indicted by the Grand Jury. On March 14, 1997, they were approved for entry into the PTI program. In addressing the issue of the 45–day rule raised by the plaintiffs, the court observed that if the 45–day time period was to run from March 15, 1997 (the day after plaintiffs were admitted into the PTI Program), the forty-fifth day would be April 28, 1997. It appears that the Preliminary Notices of Disciplinary Action and

the Charges and Specifications were, in fact, filed against the plaintiffs on April 28, 1997. However, the Notices were sent to the plaintiffs after that date, by both regular and certified mail, with the meter stamp for the regular mail being dated April 30, 1997. The certified mail was meter-stamped on May 1, 1997. Hence, plaintiffs alleged that the failure to *serve* the Preliminary Notices of Disciplinary Action on them until several days after the forty-fifth day, necessitated the charges against them being dismissed. Assignment Judge Weiss rejected the plaintiffs' argument in that regard, stating the following:

> The requirement for the filing of the complaint under *N.J.S.A.* 40A:14–147 is analogous to the running of the statute of limitations. In civil actions the statute of limitations is satisfied by the filing of the complaint with the court, even though service of the summons and complaint takes place after the running of the statute. *N.J.S.A.* 2A:14–1—2A:14–34; *R.* 4:2–2; *Grubb v. J.C. Penney Co., Inc.,* 155 *N.J.Super.* 103, 382 *A.2d* 405 (App.Div.1978). In criminal cases the statute of limitations is satisfied when a warrant or other process is issued for a nonindictable offense or the handing down of the indictment. *N.J.S.A.* 2C:1–6d. In this case the Preliminary Notices of Disciplinary Action and Charges and Specifications were filed on April 28, 1997 in compliance with the 45–day requirement of the statute. Therefore, the court rejects plaintiffs [sic] claim that *N.J.S.A.* 40A:14–147 was not satisfied in this case. [emphasis added]
>
> [*Id.* at 157–58, 709 *A.2d* 333 (emphasis added).]

In *Grubb v. Borough of Hightstown,* 331 *N.J.Super.* 398, 751 *A.2d* 1119 (Law Div.2000), *aff'd* 353 *N.J.Super.* 333, 802 *A.2d* 596 (App.Div.2002), plaintiff Grubb had been convicted in a jury trial of various criminal offenses after which the Hightstown Borough Council enacted a resolution terminating his employment consistent with *N.J.S.A.* 2C:51–2, which statute requires forfeiture of public office upon conviction of a crime. Grubb's termination by the Council occurred one day after his conviction.

Thereafter, as a result of proceedings in the Appellate Division, Grubb's Judgment of Conviction was vacated and a Judgment of Acquittal was entered. A Petition for Certification filed by the State was denied by the Supreme Court approximately four months later.

The following month, Grubb's legal counsel requested that Grubb be reinstated to his position in the Police Department. The

day after the request was made, disciplinary charges were filed against Grubb.

The disciplinary hearing commenced on February 1, 1999. At the beginning of the hearing, plaintiff moved for a dismissal of the charges alleging a failure of the Hightstown Borough to timely file the charges as required by N.J.S.A. 40A:14-147. The request was denied, after which Grubb filed a Complaint in Lieu of Prerogative Writs. Assignment Judge Feinberg rejected plaintiff's position regarding *N.J.S.A.* 40A:14-147, stating the following:

> The statute provides a simple and uncomplicated procedural mechanism for the handling of administrative charges against a police officer. *Pursuant to this statute, an administrative charge against a police officer must be filed 45 days after the date on which the department obtains "sufficient information" to file the complaint. The 45-day time limit is subject to an exception, however, where there is a concurrent investigation of the officer for a violation of the criminal laws of the state.* When there is a criminal investigation, the 45-day limit begins on the day after the disposition of the criminal investigation. [emphasis added]
>
> [*Grubb, supra,* 331 *N.J.Super.* at 405, 751 *A.2d* 1119 (emphasis added).]

Further, Judge Feinberg continued:

> *N.J.S.A. 40A:14-147 requires a reasonable outcome. If there is a pending criminal prosecution or investigation of a police officer, the statute tolls the time in which the governing body must initiate administrative charges against that officer.* By doing so, the statute permits the completion of the criminal prosecution, including grand jury and all appeals, before the governing body is required to initiate and file administrative charges. In *Palumbo v. Township of Old Bridge,* 243 *N.J.Super.* 142, 149-50, 578 *A.2d* 1234 (App.Div.1990), the court noted the futility of proceeding with administrative charges while a criminal investigation is pending:
>
>> Indeed, if such a criminal investigation were pending it is hard to envision how disciplinary proceedings could proceed since the subject of such an investigation would most likely decline to testify and invoke Fifth Amendment constitutional rights, [citations omitted] ... and might even seek a stay of administrative proceedings pending disposition of any such criminal investigation. [*Id.* at 149-50, 578 *A.2d* 1234 (citations omitted)] [emphasis added]
>
> [*Id.* at 407, 751 *A.2d* 1119 (citations omitted) (emphasis added).]

In *The Matter of Joseph McCormick,* 2001 WL 34609057 (N.J.Adm.), the Merit System Board (hereinafter the "Board") rendered its final administrative action. The Board rejected the recommendation of the Administrative Law Judge (hereinafter "ALJ") that charges against Lawrence Township Police Officer

Joseph McCormick be dismissed for failure to comply with *N.J.S.A.* 40A:14–147. The ALJ had concluded that the superior officers did not need an investigation to initiate disciplinary action against subordinates who had failed to perform their duties properly. Therefore, the delay in filing the charges due to the conducting of an investigation was unjustified and violated the statute.

The Board, in rejecting the ALJ's decision, stated the following:

*N.J.S.A. 40A:14–147 is designed to protect police officers from an appointing authority unduly and prejudicially delaying the imposition of disciplinary action. However, the statute does not prohibit an appointing authority from doing a proper investigation into a matter to determine whether disciplinary charges are necessary and appropriate.*[FN1]   The fact that such normal and necessary investigation may span a period of time, which may exceed 45 days, does not automatically call for the dismissal of such charges.   Rather, for the purposes of N.J.S.A. 40A:14–147, the charges must be brought within 45 days of the "person filing the complaint" obtaining sufficient information to bring such charges.   The "person filing the complaint" is generally acknowledged to be the Chief of Police.   See N.J.S.A. 40A:14–118.   Therefore, the 45 days start when the Chief of Police has sufficient knowledge to bring the charges against an officer.   *However, the Board does not interpret this provision to allow an appointing authority to unnecessarily delay the bringing of charges by not promptly attempting to obtain sufficient information to bring charges and promptly forwarding such information to the person responsible for filing the complaint.*[FN2] Under such circumstances, it would be appropriate to dismiss such charges against a police officer based on the 45–day rule.   *Conversely, the statute is undoubtedly not designed to force an appointing authority, at the risk of being estopped, to prospectively bring ultimately valid, but unripe, disciplinary charges within 45 days of an incident without properly investigating the matter to ensure that sufficient information to bring such charges is obtained.*

FN1.   In fact, the Internal Affairs Policies and Procedures promulgated by the Attorney General (AG Guidelines), under the section covering the investigation of internal complaints, requires that all allegations of officer misconduct shall be thoroughly and objectively investigated.   AG Guidelines at 11–20.

FN2.   The AG Guidelines state that an agency would have a difficult time justifying an extensive bureaucratic delay once any member of that agency has established sufficient information.   Id.

### *N.J.S.A.* 40A:14–181 provides the following:

Every law enforcement agency shall adopt and implement guidelines which shall be consistent with the guidelines governing the "Internal Affairs Policy and Procedures" of the Police Management Manual promulgated by the Police Bureau of the Division of Criminal Justice in the Department of Law and Public Safety, and shall

be consistent with any tenure or civil service laws, and shall not supersede any existing contractual agreements.

The Guidelines developed through the Attorney General's Office, was initially published in 1991 with the purpose of the policy being "to assist the State's law enforcement agencies with the receipt, investigation and resolution of citizen complaints of police misconduct. The ultimate goal of the policy is to improve the delivery of police services to the citizens of New Jersey." Guidelines, at 11–4. While the Guidelines were developed to address primarily the issue of internal affairs investigations into citizen complaints against law enforcement officers, the overall significance and applicability of the 45–day rule set forth in *N.J.S.A.* 40A:14–147, was discussed:

> Where an agency can conduct an Internal Affairs investigation and file disciplinary charges within 45 days of the receipt of the complaint, the 45 day rule does not become an issue. However, if an agency cannot conduct an investigation or file disciplinary charges within 45 days of the receipt of the complaint, the burden is on the investigator and ultimately the agency to identify the point at which "sufficient information" was developed to initiate disciplinary action . . .
>
> Along these same lines, it is important that there is no delay between the conclusion of the investigation by the assigned investigator, and the decision to file charges by the person who has that responsibility. Although the 45 day clock begins at the time the person who has the responsibility to file charges has sufficient information, an agency would have a difficult time justifying an extensive bureaucratic delay once *any* member of that agency has established sufficient information. . . .
>
> [Guidelines, supra at 11–20.]

Considering (1) the judicial and administrative case law discussed above, (2) the Guidelines, and (3) the plain language of the statute, the following principles emerge regarding the intent of the 45–day rule:

1. The 45–day period runs from the date upon which the person responsible for the filing of the disciplinary complaint receives sufficient information upon which to base a complaint.

2. The statute contemplates that an investigation may be necessary before a decision can be made as to whether a basis exists to initiate disciplinary charges. However, extensive bureau-

cratic delay in conducting investigations and bringing disciplinary charges is unacceptable.

█ 3. The 45–day rule applies to the *filing* of a disciplinary complaint, rather than the date of the *service* of the complaint upon the police officer.

█ 4. The intent of the statute is to protect law enforcement officers from an appointing authority unduly and prejudicially delaying the imposition of disciplinary action.

█ 5. The 45–day time limit does not apply if an investigation of a police officer for violation of the internal rules or regulations is included directly or indirectly with a concurrent investigation of the officer for a violation of the criminal laws. In such event, the 45–day time limit will commence on the day after the disposition of the criminal investigation.

6. The requirement that the disciplinary hearing take place within ten to thirty days from the service of the Complaint underscores the statutory intent that disciplinary matters be resolved expeditiously.

*N.J.S.A.* 40A:14–118 provides that a governing body of any municipality may, by ordinance, create and establish a police force and may provide for the appointment of a Chief of Police. The Chief of Police, as head of the police force, is responsible pursuant to policies established by the appropriate authority to "[a]dminister and enforce rules and regulations and special emergency directives for the disposition and discipline of the force and its officers and personnel." Consistent with this statutory provision, the Atlantic City Code, Article I, § 52–4 provides the following:

> The Chief shall be the head of the Division. The Chief shall be directly responsible to the appropriate authority for the efficiency and routine day-to-day operations of the Division. The Chief's powers include, but are not limited to, the following:
>
> A. Administer and enforce the Rules and Regulations of the Division and any special emergency directives for the disposition and discipline of the Division and its officers and personnel.
>
> B. Have, exercise and discharge the functions, powers and duties of the Division.

C. Prescribe the duties and assignments of all members and officers.

D. Delegate such authority as deemed necessary for the efficient operation of the Division to be exercised under the Chief's direction, supervision and control.

E. Report at least monthly to the appropriate authority, in such form as shall be prescribed in the Rules and Regulations, on the operation of the Division during the preceding month, and make such other reports as may be requested by the appropriate authority. See N.J.S.A. 40A:14–118.

Article I, § 52–2 of the City Code designates the Mayor or his designee as the Appropriate Authority pursuant to *N.J.S.A.* 40A:14–118. Pursuant to the statute and the City Code, the appropriate authority promulgates and adopts rules and regulations for the government of the police department and for the discipline of its members. The Chief of Police enforces and administers the rules and regulations and disciplines members of the police department.

The New Jersey State Policemen's Benevolent Association asserts the following:

... the City attempts to excuse its failure to comply with the rule by arguing that the charges were filed within 45–days after the Chief received the results of an Internal Affairs investigation on December 18, 2004. The City's position, if accepted, would give municipalities license to delay internal investigations, whether through intent, mismanagement, or otherwise to avoid the application of the 45–day rule. There was nothing to prevent the City in this case from initiating an Internal Affairs investigation promptly to identify officers who had committed infractions of rules and regulations. Instead, the City acted precipitously and rashly in imposing disciplinary sanctions, without notice and without a hearing, which were subsequently rescinded. It was not until *after* disciplinary sanctions were initially imposed that the City decided that it should initiate an Internal Affairs investigation.

In determining whether to dismiss the disciplinary charges against the police officers based upon the 45–day rule, it is important to keep in perspective the nature of the two previously discussed matters initiated in August 2004 involving (1) Local PBA # 24, (2) the City, and (3) the police officers who are now involved in the instant litigation. In the first matter, which was the Chancery Division proceeding commenced by the City on August 22, 2004, the City validly pursued injunctive relief to ensure that any further sick-outs or work stoppage would be prohibited. It is well settled that in New Jersey "public employees do not have the

right to strike ..." *Passaic Tp. Bd. of Educ. v. Educ. Ass'n.*, 222
*N.J.Super.* 298, 303, 536 *A.*2d 1276 (App.Div.1987). See also,
*N.J.S.A.* 34:13A–14 which is specifically applicable to public fire
and police departments. Hence, the purpose of that litigation as
noted in the August 22, 2004 Order was to ensure that any further
concerted activity by PBA members "which would compromise the
safety and security of the general public and the residents of the
City of Atlantic City" would cease and desist.

Also intertwined within the Chancery Division litigation while it
remained pending for approximately four months were attempts to
resolve the issue of the new Collective Bargaining Agreement, and
the looming possibility of the imposition of financial sanctions
against the PBA and/or individual police officers. The City, in its
Motion filed on November 3, 2004, sought monetary sanctions to
reimburse the City for (1) the overtime that was required to keep
the police force operational during the sick-out, and (2) legal fees.
The City also suggested that "to the extent that the Court deems
it appropriate, contempt proceedings should be initiated." How-
ever, it must be emphasized that at no time between August 22,
2004 and December 14, 2004 were civil or criminal contempt
proceedings initiated. The filing of the *R.* 1:10–3 Motion by the
City did not equate to a contempt proceeding, either civil or
criminal. Further, at no point was a criminal investigation com-
menced to determine whether the third shift contumaciously vio-
lated Judge Segal's Order such that criminal charges for contempt
of a court Order should be filed. Clearly, the first two shifts
failing to report to work had no exposure to contempt proceedings
since their conduct occurred prior to the entry of Judge Segal's
Order granting injunctive relief.

The second matter was the filing of Notices of Disciplinary
Action by Fitzgerald on August 23, 2004 against the three shifts of
police officers who failed to report to work. The nature and the
purpose of the disciplinary proceedings was different from the
Chancery Division litigation, in that the focus was the imposition
of individual discipline upon each of the police officers who may

have violated departmental rules and regulations by engaging in an illegal sick-out and defying the orders of their superior officers. The purpose of initiating disciplinary action is to ensure the desired level of discipline within a law enforcement unit by addressing complaints of misconduct or inappropriate behavior, utilizing a system of progressive discipline. Guidelines at 11–8 to 11–10. On the other hand, the purpose of seeking sanctions pursuant to *R.* 1:10–3 is to compel compliance with a court order.

The issue before the court is not whether some or all of the Plaintiffs and Intervenors should be disciplined, assuming for argument's sake that they engaged in the conduct for which they were charged in the Chief's Notices of Pending Disciplinary Action, but rather, whether the 45–day rule set forth in *N.J.S.A.* 40A:14–118 was violated.

There is little question but that the Chief filed his Notices of Pending Disciplinary Action within forty-five days of his receipt of the results of the investigation which was conducted by Glass. However, that does not resolve the dispute before the court. Rather, it is the series of actions and inactions on the part of the City, either through the Business Administrator and/or Office of the Chief of Police from August 22, 2004, to the commencement of the investigation on November 2, 2004, which is dispositive. A summary of the critical events follows:

1. Based on the affidavit submitted by Jubilee in support of the August 22, 2004 injunction, he and Fitzgerald knew as of that date that a substantial number of police officers may have violated departmental rules and regulations, although they certainly could not have known at that point how many or which specific officers scheduled for the first two shifts may have had valid reasons not to report to work, due to legitimate illness or other personal emergency.

2. As of August 23, 2004, Jubilee and Fitzgerald knew that another thirty-nine police officers or some portion thereof may have violated departmental rules and regulations, as well as a

court Order, although, again, they did not necessarily know which of those thirty-nine police officers may have had valid reasons to fail to report to work.

3. On August 23, 2004, the Business Administrator filed Notices of Disciplinary Action upon all police officers assigned to the three shifts, imposing fines without an opportunity for the police officers to appeal or contest the charges for which they were being disciplined.

4. On September 4, 2004, the City commenced deducting the fines from each police officer's paycheck, again, without an investigation having occurred, and without an opportunity for the police officers to challenge the disciplinary action.

5. One week later, the paycheck deductions were reversed by the City. However, there is no evidence in the record before the court that the Notices of Minor Disciplinary Action issued by Fitzgerald were rescinded.

6. The Chief resumed his duties on September 23, 2004.

7. On September 29, 2004, the Chief questioned the authority of the Business Administrator to discipline the police officers, citing *N.J.S.A.* 40A:14–118 and the City Code. The Chief was reluctant to move forward with disciplinary proceedings absent an investigation, or to proceed with an investigation in view of the pendency of the Chancery Division litigation.

8. On October 4, 2004, "All Police Personnel" were directed to respond to a "fact-finding investigation" of police personnel who called out sick on August 21 and August 22, 2004.

9. On October 4, 2004, the fact-finding investigation was suspended as to eighty-four of the police officers notified earlier that day that they were to participate in a fact-finding investigation.

10. On October 26, 2004, the Business Administrator directed the Chief to resume the investigation.

11. On November 2, 2004, eighty-four police officers were once again directed to respond to the fact-finding investigation.

12. The results of the fact-finding investigation were transmitted to the Chief on December 17, 2004, with the Chief filing Notices of Pending Disciplinary Action on December 22, 2004.

Notwithstanding that it was readily apparent by August 23, 2004, that there were valid reasons to consider initiating disciplinary proceedings against some or all of the police officers who failed to report for duty on August 21 and 22, 2004, the filing of the Notices of Disciplinary Action on August 23, 2004 by Fitzgerald usurped the statutory authority of then Acting Chief Jubilee. As previously discussed, both *N.J.S.A.* 40A:14–118 and the City Code vest the Chief (or Acting Chief in the absence of the Chief) with the authority to discipline members of the police force pursuant to rules and regulations promulgated by the appropriate authority.

It is also clear that based upon the events of August 21 and 22, 2004, absent an investigation, the filing of disciplinary charges whether by the Acting Chief or Chief, would likely have resulted in some police officers being charged with disciplinary action, notwithstanding that they had a valid reason for failing to report to work. It is a safe assumption that at least some percentage of the 114 police officers who collectively failed to report to work, would have a valid reason for doing so. In fact, the investigation which was completed in November and December 2004 reveals that least six police officers may have had valid excuses for failing to report to work. Hence, that an investigation was justified and necessary in the instant matter is not subject to debate.

However, what is problematic is the timing of the *true* commencement of the investigation on November 2, 2004, in essence, a period of seventy-two days from the date of the conduct complained of. *N.J.S.A.* 40A:14–118 does not specify a time frame within which an investigation into violations of departmental rules and regulations must commence. However, there is little question based upon a literal reading of the statute, and the principles which emerge from the case law cited above, that barring extraordinary circumstances (which do not exist in the instant case), the

investigation should commence promptly after the occurrence of events which may warrant disciplinary action. This is particularly true where the City and Acting Chief believed that the events of August 21 and 22, 2004 were of such immediate concern that legal action was necessary on August 22 and August 23, 2004. Additionally, there were no further events after the entry of Judge Seltzer's Order which might justify a lengthy delay in commencing an investigation. It should also be noted that the investigation did not involve a complicated matter. Either the police officers had valid excuses for failing to report to work, or, they did not.

The statute is clear. A simultaneous criminal investigation will toll the 45–day rule. Additionally, the 45–day rule is not applicable if it is a private citizen who actually files the Complaint. Neither of those circumstances exist in the instant case.

The pendency of the Chancery Division action did not constitute a justifiable basis to delay the commencement of the investigation for more than two months, which resulted in the charges being filed by the Chief more than 120 days after the events occurred. The possible imposition of civil monetary sanctions pursuant to *R.* 1:10–3 had no bearing on the initiation of an investigation and the filing of disciplinary proceedings. A *R.* 1:10–3 proceeding constitutes neither a civil nor criminal contempt proceeding.

Delaying the commencement of the investigation for more than two months because of the pendency of Chancery Division proceedings condones a "wait and see" approach to commencing a law enforcement disciplinary investigation until civil litigation, albeit arising out of the same events, is resolved. To conclude that such delay is acceptable would carve out another exception to the 45–day rule which simply is not contemplated within the statute. Had the Legislature intended that the pendency of other non-criminal litigation would justify delaying the commencement of a disciplinary investigation and/or the filing of disciplinary charges, it would have so provided.

Further, some of the cause for delay in commencing the litigation may have been due to the fact that Notices of Disciplinary

Action had been filed against the police officers by Fitzgerald on August 23, 2004, with no indication that those charges were ever actually rescinded. The police officers were placed in the untenable position of having a Disciplinary Action imposed while simultaneously being investigated for new charges being filed based upon the same events. Fitzgerald and the Chief were clearly at odds with regard to the initiation of disciplinary action.

However, such situation does not justify the failure to commence an immediate investigation into the events of August 21 and 22, 2004. The fact that the August 23, 2004 Notices may have been precipitously filed by the City without statutory authorization to do so, did not in any way mitigate or excuse the need to conduct a prompt investigation.

As simply put by the State PBA in its brief, "the City's position, if accepted, would give municipalities license to delay internal investigations, whether through intent, mismanagement, or otherwise to avoid the application of the 45–day rule."

## CONCLUSION

The City is permanently enjoined from proceeding with the disciplinary hearings arising from the charges filed by the Chief on December 22, 2004.

A telephonic case management conference is scheduled for April 19, 2005 at 10:00 A.M., to determine whether any additional issues need to be resolved in this matter. Mr. Mackler shall place the conference call.